**Noble Lee KIESCHNICK, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–94–346–CR.**

Court of Appeals of Texas,
Waco.

Oct. 25, 1995.

Ordered Published Nov. 22, 1995.

Opinion Granting Rehearing Nov. 22, 1995.

Walter M. Reaves, Jr., Waco, for appellant.

Ronald D. Hankins, County Attorney, Glen Rose, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Cindy and Welby Simpson live on County Line Road, which runs along the boundary between Somervell County and Bosque County. They bought two Chinese Pugs at different times in the Spring of 1994. In July, they returned home to find the dogs missing. A search of the "sparsely populated" area and inquiries to neighbors failed to locate them. In September, they learned from their veterinarian that he had boarded similar dogs for a two-week period but, because no one claimed them, had given them to a lady in Walnut Springs. Following this lead, Cindy traced the dogs to Nobel Kieschnick. When he did not surrender them, he was charged with theft of property having a value between $500 and $1,500. TEX.PENAL CODE ANN. §§ 31.01, 31.03 (Vernon 1994). A

jury returned a verdict of guilt, and the court assessed a $2,000 fine.

In two points, Kieschnick attacks the sufficiency of the evidence to sustain the verdict. In particular, the points assert that the evidence is insufficient to establish (1) the identity of the property, *i.e.*, the dogs, and (2) intent to acquire or exercise control over property of another. Both points essentially rely on the claim that the State failed to prove that the Simpsons owned the particular dogs that were in Kieschnick's possession.

■ We will employ the standard of review that has been adopted for all cases. *Geesa v. State,* 820 S.W.2d 154, 156–57 (Tex. Crim.App.1991). Under this standard, evidence will sustain a conviction if, viewing it in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App.1991). "This standard is the same for both direct and circumstantial evidence cases." *Green v. State,* 840 S.W.2d 394, 401 (Tex.Crim.App. 1992), *cert. denied,* 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993).

■ The evidence shows that two Chinese Pugs were found on July 17, 1994, in the vicinity of County Line Road and eventually delivered to Dr. Mike Jones, a veterinarian. Dr. Jones and his staff searched his computerized records for similar dogs that had been in his clinic during the past five years and contacted their owners to determine if any were missing. Failing to find the owner after two weeks, Dr. Jones delivered the dogs to Shelly LeMays, who said that she knew someone who might "adopt" them. LeMays delivered the dogs to Julie and Noble Kieschnick, her sister and brother-in-law, who live in Cedar Hill, Texas.

After Dr. Jones gave LeMays' phone number to her, Cindy contacted LeMays about the dogs. LeMays talked to both her sister and Cindy over several days but failed to resolve the matter. She ultimately gave Cindy the Kieschnicks' first names and telephone number.

Cindy called to inquire about the dogs. When Kieschnick returned the call, he refused to tell her his last name or where he lived, but stated that he had paid "veterinary expenses and boarding bills" of $500 for the dogs. He told Cindy that his wife, Julie, had "been up all night crying when she found out that the owners of the dogs appeared" and that "they did not want to give up the dogs." When Cindy offered to go to Cedar Hill and pick the dogs up on the following Friday, Kieschnick refused, saying he would have to talk to Julie. Several days later, he called Cindy back, telling her how attached to the dogs Julie had become and that the expenses were "upwards of $1,000." The Simpsons then complained to the Somervell County Sheriff's Department.

Deputy Doug Ransom, an investigator with the Sheriff's Department, left a message on Kieschnick's answering machine. Kieschnick called him back, confirmed that he had two dogs, and wanted "around $1,000" in expenses—$500 in vet bills and $14–16 per day for boarding the dogs. Ransom said that Julie Kieschnick told him the vet bill was around $350. He also stated that during their first conversation Kieschnick said "he'd rather not" give his last name, but ultimately gave the officer his name and address. Ransom encouraged the Kieschnicks to "settle" the matter. He said, however, that they did not indicate a willingness to return the dogs.

Although the Simpsons had American Kennel Club papers they had received when they purchased the dogs, no steps had been taken to transfer the registrations to themselves. Dr. Jones said that a positive identification of the animals could not be made from the descriptions on the papers. He also said that there were "approximately ten" similar dogs in Somervell County listed in his records. Welby Simpson testified that he could not say that the dogs that Kieschnick had were his dogs because he had not had an opportunity to see them.

Julie Kieschnick testified that she got the dogs from her sister, who had gotten them from a veterinarian in Glen Rose. She said her sister later told her that Cindy was looking for the dogs. After Julie had several telephone conversations with her sister, No-

ble Kieschnick called the Simpsons but did not resolve the matter. Julie said that she never denied the Simpsons the opportunity to come to see the dogs and that they "never offered to show us any proof of any kind of ownership for these dogs."

Kieschnick testified that he had not really wanted the dogs and had told Julie if she accepted them she would have to take care of them. He said that when he first contacted Cindy:

I told her that we had a couple of pugs that she had been inquiring about and that my wife was attached to them. She would be willing to give the dogs up, however, provided we were compensated for expenses and that they could prove ownership such as photographs of them with the dogs and possibly papers.

I told her that we had figured our expenses to be approximately $1,000.

He further said that he did not deny either the Simpsons or Ransom the right to see the dogs, but no one ever came to identify them. He said that the AKC papers do not prove ownership because "[t]here's no serial number on a dog that matches the serial number on these papers." He said that at the time of trial the dogs were still at his home and he was still willing for the Simpsons to identify the dogs as theirs.

The jury, as the trier of fact, is free to accept or reject any or all of the evidence presented by either party. *Beardsley v. State,* 738 S.W.2d 681, 684 (Tex.Crim.App. 1987). Reconciliation of conflicts in the evidence is solely a function of the trier of fact. *Bowden v. State,* 628 S.W.2d 782, 784 (Tex. Crim.App.1982).

In making our assessment of the sufficiency of the evidence, we bear in mind that this is a circumstantial-evidence case in which no witness identified the dogs possessed by Kieschnick as being those lost by the Simpsons. Viewing the evidence in the light most favorable to the verdict, however, we find that there is conclusive evidence that the dogs delivered to Dr. Jones were the same dogs possessed by Kieschnick. Thus, the question is whether the evidence is sufficient to prove circumstantially that the dogs that

the Simpsons lost were the same dogs delivered to Dr. Jones.

Finding evidence that (1) the Simpsons lost their dogs during July 1994 and that the dogs delivered to Dr. Jones were found on July 17, 1994, (2) the Simpsons' dogs were lost on County Line Road in a sparsely populated area of the county, the same road on which the dogs delivered to Dr. Jones were found, and (3) a small number of similar dogs were listed in Dr. Jones records, none of which were reported missing by their owners, we believe that a rational trier of fact could have found beyond a reasonable doubt that the dogs the Simpsons lost were the same ones Kieschnick possessed. *See Matson,* 819 S.W.2d at 843. Thus, Kieschnick's points are without merit and are overruled.

We affirm the judgment.

CUMMINGS, Justice, dissenting.

I dissent because I do not believe that the evidence was legally sufficient to establish that Kieschnick intended to deprive the Simpsons of the value of the dogs. I disagree with the majority's assumption that both points of error "essentially rely on the claim that the State failed to prove that the Simpsons owned the particular dogs that were in the Kieschnick's possession," because I believe "identity" of the dogs and "intent to deprive the owner of property" are two distinct and separate issues.

Even though this matter turned into a criminal charge rather hurriedly without the Simpsons or any law enforcement agencies ever identifying the dogs when this could have been accomplished by a search warrant or other discovery procedures, I assume for the purposes of this dissent that the dogs in question were actually the same dogs that left the Simpson's premises.

There is no evidence in this record, however, that the dogs were stolen from the Simpson's premises. In fact, the testimony reveals that Kathy Marie Singletary's mother found these dogs on a dirt road between Glen Rose and Walnut Springs on Sunday, July 17, 1994. Kathy began to try to find "some people that might have a big heart" to take the dogs. She first went to a golf course in

Glen Rose and couldn't find anyone who would take a pair of dogs. Next, she waited at the sheriff's department for the animal control officer, but after a long wait, decided that if no one claimed the dogs from the animal control officer in three days that they would be put to sleep, so she contacted Sheryl West who worked at a veterinary clinic. Sheryl West agreed to take the dogs to the clinic to board them until the owners could possibly be found. Sheryl West described the dogs as being infested with fleas and ticks and the female as having a lot of hair loss. She testified that these were not the type of dogs that people would abandon, so she made efforts to find the owners by contacting the animal control officer and by doing a computer search of the office records of people who owned Chinese pugs. After boarding the dogs for two weeks without having any success in finding the owner, it was determined to find someone who would "adopt" the dogs. A clinic employee contacted Shelly Lemays about adopting the dogs. Ultimately, Shelly's sister, Julie Kieschnick, "adopted" the dogs. So, the Kieschnick's obtained the dogs from the veterinary clinic apparently under the belief that the dogs were lost or abandoned and that the owner could not be found. There is no evidence that at the time Julie took the dogs that she intended to deprive the owner of the dogs. The owners were unknown at that time. According to Julie's testimony she had expended $350 on veterinary bills for the dogs and an additional $150 for collars, food and dog beds. Julie had the dogs for over a month before getting word from her sister that the Simpsons were claiming they owned the dogs and wanted them returned.

Julie had previously owned a Chinese pug that had died two years before and this was her reason for wanting the dogs. Julie apparently became very attached to the dogs and did not want to give them up; however, she stated in her testimony she was willing to return the dogs to the Simpson's upon proper proof of ownership and being reimbursed for her expenses. Julie testified that she never refused to let anyone come and look at the dogs, even though the only time suggested by Mrs. Simpson was a workday for Julie. No other date was suggested and apparently the Simpson's went immediately to the sheriff's department to file the complaint which became the basis for this prosecution. After the sheriff's department became involved, there was no effort to obtain the dogs from the Kieschnick's or to arrange for the alleged owners to see and identify the dogs. At the time of trial, the Kieschnick's were still in possession of the dogs and each testified of their willingness to allow the dogs to be seen. Deputy Sheriff Ransom testified that he tried to mediate the matter to reach a settlement without the matter going to court. When Deputy Ransom first called the Kieschnick's telephone number he received a taped recording and left a message, which Mr. Noble Kieschnick returned. After Deputy Ransom told Kieschnick who he was, Kieschnick gave him his full name and address in Cedar Hill. After obtaining the Kieschnick's address, however, no effort was made to view the dogs or confiscate them. In Noble Kieschnick's testimony he stated that he had requested a photograph of the Simpson's with the dogs as proof of their ownership. Even though other methods of proof might have been satisfactory, this was what he suggested at that time. It is common knowledge that pets will usually come to their owners, but no effort was ever made by the sheriff's department to have the Simpsons view the dogs.

Even though Noble Kieschnick had refused to give his last name to anyone until Deputy Ransom talked to him, certainly his address would have been readily available to law enforcement since they had his telephone number. Considering all the circumstances involved in this case, one cannot conclude that the Kieschnick's were hiding the fact they had the two Chinese pugs which Julie obtained from Dr. Mike Jones' veterinary clinic. Certainly, these facts do not resemble the classic dog theft cases where a thief steals and conceals a dog for a reward or ransom. There was no evidence that Noble Kieschnick intended to exact a reward or other compensations for the Chinese pugs when the dogs were obtained by his wife, Julie, from Dr. Jones. Compensation only became an issue after the alleged owners appeared in September 1994. There is no

evidence that Noble Kieschnick intended to hold the dogs for a reward or compensation when his wife "adopted" the dogs. The only intentions involved in the circumstances of this case from the time the dogs were found by Kathy Singletary's mother until Julie Kieschnick "adopted" the dogs from the clinic were apparently to find a good home for the dogs.

Theft is a serious crime involving moral turpitude which a person should not be branded with under the circumstances of the acquisition of these dogs. The facts of *Martin v. State*, 44 Tex.Crim. 538, 72 S.W. 386, 387 (1903), parallel the facts of this case. In that case, Mr. Martin found some money and took it home to his wife to hold for safekeeping until he could get to town to seek advice from the law officers in finding the owner of the money and at the same time to ask the law officers' assistance in obtaining any reward that might be offered for return of the money. The trial court had refused to grant Martin a continuance on the account of the absence of his wife who was ill and who would have testified that Martin did leave the money with her under those instructions. Martin's theft conviction was reversed for the reason that the trial court erred in refusing to grant the continuance because the wife's testimony was material to his defense to show that he did not hide or conceal the money and was willing to return it to the owner. *See also* 19 Tex.Jur.3d *Criminal Law* § 568 (1982).

Finally, the issue in this case is whether Noble Kieschnick committed theft by requesting compensation before returning the dogs to the alleged owners. The Penal Code defines "Deprive" as follows:

(B) to restore property only upon payment of reward or other compensation; or ...

Tex.Penal Code Ann. § 31.01(2)(B) (Vernon 1994). I believe the legislature intended that, for a person to be guilty of theft where

the prosecution relies on the definition of "deprive" as stated above, that the accused must have the intent to hold the property for a reward or compensation at the time he obtains the property. *See Stepp v. State*, 31 Tex.Crim. 349, 20 S.W. 753 (1892)[1]; *see also* 19 Tex.Jur.3d, *Criminal Law* § 568 (1982) (These code provisions [Tex.Penal Code Ann. § 31.01(2)(B), *supra*] appear to codify prior decisional law, ...).

In this case, there was no intent by Noble Kieschnick to hold these dogs for a reward or compensation at the time his wife obtained the Chinese pugs. The dogs were obtained legally and, in my opinion, after Noble Kieschnick gave his name and address to Deputy Ransom, there was no hiding or concealment of the dogs. There being no evidence of intent to hold the dogs for a reward or compensation when they were "adopted" by Julie Kieschnick, this should not be a criminal case. At most, it is a civil suit for money damages and/or custody of the dogs. For these reasons, I respectfully dissent and would reverse the theft conviction in this case.[2]

## OPINION ON MOTION FOR REHEARING

VANCE, Justice.

The State relied on circumstantial evidence in this case for an essential part of its proof. In a motion for rehearing, Kieschnick assails us for using the standard of review mandated by *Geesa v. State* in the absence of an instruction in the court's charge defining "reasonable doubt." *Geesa v. State*, 820 S.W.2d 154, 161–62 (Tex.Crim.App.1991).

When we turn to *Geesa* for further guidance in determining the applicable standard of review, we find this directive about the reasonable-doubt instruction:

We expressly adopt [the specified] instruction on "reasonable doubt" and hold that

---

1. Holding that the trial court properly submitted the following charge to the jury: "To constitute a finding theft, the intent to defraud the owner and appropriate the property to his own use must exist in the mind of the finder at the time he takes possession of the property. If the intent to steal did not exist at the time of the taking, no

subsequent intent to steal will render the original taking theft."

2. Since Julie had become attached to the dogs, a logical solution might have been for the Kieschnick's to offer to buy two similar breeding dogs for the Simpsons.

this instruction shall be submitted to the jury in all criminal cases, even in the absence of an objection or request by the State or the defendant, whether the evidence be circumstantial or direct.

*Id.* at 162.

## DEFECTIVE CHARGE

■ We have confirmed from the record that the jury charge given by the court does not contain the reasonable-doubt instruction mandated by *Geesa. Id.* Kieschnick did not object to the charge in the trial court or raise the court's use of an erroneous charge as a point of error in his brief. Nevertheless, we conclude that we have no choice but to reverse the judgment and remand the cause for another trial.

*MARIN v. STATE*

■ In *Marin v. State,* the Court of Criminal Appeals recognized that a defendant's rights arise from distinct rules that generally fall into one of three categories: (1) absolute requirements and prohibitions; (2) rights which must be implemented by the system unless expressly waived; and (3) rights which are implemented only upon request. *Marin v. State,* 851 S.W.2d 275, 279 (Tex. Crim.App.1993). Rights which must be implemented unless waived, as well as absolute requirements and prohibitions, cannot be made subject to procedural default because, by definition, they are not forfeitable. *Id.* Determining which category a right falls into will usually settle the question of whether a procedural default occurred. *Id.*

■ Absolute rights cannot be avoided, even with consent. *Id.* at 280. Implementation of these rights is not optional and cannot be waived or forfeited. *Id.* at 279. A defendant may complain about the violation of an absolute right or prohibition on appeal without having raised the question in the trial court. *Id.* at 280. An example of an absolute right is jurisdiction. *Id.* at 279.

■ Rights in the second category—waivable rights—do not vanish easily; a litigant does not give them up unless he does so plainly, freely, and intelligently. *Id.* at 280. If a litigant wants to relinquish this type of right, he must expressly do so, *i.e.,* the "intentional relinquishment or abandonment of a known right or privilege." *Id.* at 279 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Sometimes the waiver must be in writing; always, it must be on the record. *Id.* at 280. The judge has an independent duty to implement such rights, absent an effective waiver. *Id.* Many constitutional rights fall into this category. *Id.* at 279.

■ The third category includes rights that arise from rules that are optional with a litigant. *Id.* at 278. Rule 52(a) applies only to rights which the judge must implement on request of a party and which will be forfeited if no complaint is made at trial. *Id.* at 280; TEX.R.APP.P. 52(a). The judge has no independent duty to enforce these rights. *Marin,* 851 S.W.2d at 278. A litigant is not required by Rule 52(a) to do more for the preservation of a complaint on appeal than was required to secure the right at trial. *Id.* Ordinary objections to evidence and procedural benefits are included in this category. *Id.* Rule 52(a) reaffirms these basic principles of adversarial litigation; it was not meant to amend or repeal them. *Id.* at 280. It does not apply to rights of appeal granted by statutes. *See id.* at 278.

CHARGE ON REASONABLE DOUBT

■ The Court's choice of language in *Geesa* mandating the reasonable-doubt instruction precludes the possibility that it is a right to be implemented only on request. *See id.* at 279; *Geesa,* 820 S.W.2d at 162. That means the right to the instruction is either (a) an absolute right or (b) a right that must be implemented unless expressly waived. *See Marin,* 851 S.W.2d at 279.

We believe that, although such rights are "relatively few," the Court intended to create an absolute systemic requirement that every charge, when the burden of proof requires the jury to find guilt beyond a reasonable doubt, contain the definitional instruction on reasonable doubt.

*Marin* recognizes that the category of nonwaivable, nonforfeitable systemic rights includes some rights other than those labeled

"jurisdictional." *Id.* These requirements and prohibitions are implemented independently of the litigants' wishes. *Id.* As absolute requirements and prohibitions, they are to be observed even without partisan request; they cannot be lawfully avoided, even with partisan consent. *Id.* at 280. They are, as stated above, not subject to "procedural default." *See id.* at 279. Thus, *Marin* establishes that the right to the *Geesa* instruction on reasonable doubt cannot be procedurally defaulted by failing to request or object in the trial court. *Id.* The question here is: Was Kieschnick's right to the instruction procedurally defaulted when he failed to complain about it on original submission? For reasons we will explain, we believe the answer is "no."

The requirement that a complaint be presented to an appellate court in a point of error is a "procedural" requirement, just like the necessity of stating a request or objection in the trial court to preserve complaints about the denial of rights implemented only on request. *See* Tex.R.App.P. 52(a), 74(d). Having determined that Kieschnick's right to the definitional instruction on reasonable doubt is an absolute right and because "[d]etermining which category a right occupies will usually settle the question of procedural

default in the context of a particular case," we find that our implementation of Kieschnick's right to the instruction is not dependent on the procedural formality of a complaint in a point of error. *See Marin,* 851 S.W.2d at 279. Furthermore, we are authorized to "revise the whole case upon the law and facts, as exhibited in the record." *Carter v. State,* 656 S.W.2d 468, 468 (Tex.Crim. App.1983). Our jurisdiction is not constrained by the concept of "unassigned error." *Id.* Thus, the limits of the issues we may address are set only by our own discretion and valid restrictive statutes. *Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Crim.App. 1990). We hold that the court erred when it failed to include the mandatory definitional instruction on reasonable doubt in the charge given to the jury. Finding that the charge given by the court to the jury is defective, we turn to the question of harm. Tex.R.App.P. 81(b)(2).

## HARM ANALYSIS

 A harm analysis is not required.[1] *See Stine v. State,* 908 S.W.2d 429, 430 (Tex. Crim.App.1995) (violation of mandatory, nonwaivable constitutional requirement that district court sit at county seat does not require harm analysis).[2]

1. Were we called on to make the analysis in light of the nature of the circumstantial evidence described in our original opinions, we would hold that Kieschnick was harmed because we could not say beyond a reasonable doubt that the failure to include the reasonable-doubt instruction did not contribute to his conviction. *See* Tex. R.App.P. 81(b)(2).

2. Our review of *Marin* causes us to believe that it may contain the basis for a "bright-line" rule for applying Rule 81(b)(2) that the intermediate courts seek. Tex.R.App.P. 81(b)(2). Although *Marin* does not address the question of harm in relation to the categories of rights that it recognizes, it does address the harm question presented by the case itself—error in denying a waivable right—and concludes that the court of appeals incorrectly applied both Rule 52(a) and 81(b)(2) to the complaint and error. *Marin v. State,* 851 S.W.2d 275, 282 (Tex.Crim.App.1993). It speaks in terms of the difficulty in knowing how such an error affected the trial and the "likelihood that [such errors] have influenced the outcome [being] so strong that it is not worth expending the judicial resources necessary to evaluate the effect of the error in particular cases." *Id.* (quoting *Sodipo v. State,* 815 S.W.2d 551, 551 (Tex.Crim. App.1990)). Rule 81(b)(2), like Rule 52(a), is

court-made. Tex.R.App.P. 52(a), 81(b)(2). We believe the logic of the *Marin* opinion leads to the conclusion that, if a right is so fundamental to a defendant that it cannot be waived or can be waived only on the record, a violation of that right should be presumed to have resulted in harm. Stated another way: Only when the implementation of a right can be subjected to a court-made procedural-default rule, such as Rule 52(a), can a violation of that right be made subject to a court-made rule requiring a harm-analysis. Thus, harm analyses would be applied only to category-three rights—those that must be implemented on request.

Our own experience is that, when rights that are absolute or are waivable only on the record are violated, any analysis of harm based on a typical appellate record invariably "defies empirical examination." *See Marin,* 851 S.W.2d at 282. Giving Rule 81(b)(2) effect only when Rule 52(a) also applies would "assure that the [harmless-error] rule does not exceed its limited purpose [of avoiding] reversal of criminal convictions for clearly unimportant or inconsequential errors." *Id.*

We recognize that *Boozer v. State* holds that *Geesa's* irrebuttable presumption against waiver

## CONCLUSION

Because the court erred in omitting the definitional instruction on reasonable doubt, we grant the motion for rehearing, set aside our judgment, reverse the judgment of conviction, and remand the cause to the trial court for a new trial.

did not also create an irrebuttable presumption of harm and that the failure to give "a small portion" of the instruction did not, absent an objection at trial, egregiously harm Boozer.

*Boozer v. State,* 848 S.W.2d 368, 369–70 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd). Here, the court failed to include the *entire* reasonable-doubt instruction.