Lohmuller v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-308-CR

Â Â Â Â Â Â Â Â HOWARD LOHMULLER,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant
Â Â Â Â Â Â Â Â v.

Â Â Â Â Â Â Â Â THE STATE OF TEXAS,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee
 

From the County Court at Law
Ellis County, Texas
Trial Court # 93-11238-CR
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

O P I N I O N
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â Â Â Â Â Â Â Â Â Â We must decide whether a driver, who has a policy of liability insurance in effect at the
time of an accident but allows his driver's license to be suspended after a judgment is rendered
against him, is entitled to have a later charge of "driving while license suspended" dismissed when
he produces the insurance policy at the criminal trial. We conclude that he is not. We reverse the
conviction, however, because the court failed to charge the jury on the definition of reasonable
doubt.
PROCEDURE
Â Â Â Â Â Â Â Â Â Â Howard Lohmuller was convicted in a jury trial of driving a motor vehicle while his license
to drive was suspended. Tex. Rev. Civ. Stat. Ann. art. 6701h, Â§ 32(c)(1)(A) (Vernon Supp.
1996). The jury assessed 30 days in jail, which it elected to probate, and a $100 fine. Id. Â§
32(c)(4)(A) & (B). Lohmuller represented himself at trial and does so on appeal. He asserts four
points of error: (1) that his right to a speedy trial was violated; (2) that the information was
insufficient to charge him with the crime; (3) that he conclusively established a defense to the
charge; and (4) that the law is unconstitutional and he was denied due process. 
THE TRIAL
Â Â Â Â Â Â Â Â Â Â The State's only witness, Highway Patrolman Steve McKinney, testified that he and
Trooper Brad Zolinsky encountered Lohmuller on Interstate 35E, about six miles south of
Waxahachie, on May 22, 1993. They stopped him because he was not wearing a seat belt. A
check of Lohmuller's driver's license revealed that it was under a suspension order.
Â Â Â Â Â Â Â Â Â Â State's Exhibit 1, a certificate from the Driver Records Bureau of the Driver Licensing and
Control Service of the Texas Department of Public Safety, shows that Lohmuller's driver's license
was suspended in case number OOJ1372217 because of an unpaid judgment arising out of an
accident in Dallas on March 15, 1991. The exhibit includes a certified copy of the order that the
Department issued on August 6, 1992 suspending Lohmuller's license pending the (1) filing of
evidence that the judgment rendered by the Justice of the Peace in Dallas had been satisfied, (2)
filing of proof of financial responsibility for the future, and (3) payment of a reinstatement fee of
$50. The order required Lohmuller to surrender his driver's license, registration receipts, and
license plates.
Â Â Â Â Â Â Â Â Â Â McKinney also testified that the Department's records showed that Lohmuller's license was
still suspended on the date of the trial, August 23, 1995.
Â Â Â Â Â Â Â Â Â Â After the State rested its case, Lohmuller made a motion to dismiss based on defects in the
information. When the court denied his motion, he initially declined to offer evidence but, after
an extended discussion with the court out of the jury's presence, testified on his own behalf. He
said that he had a policy of insurance in effect on the date of the 1991 accident in Dallas, that he
felt that the other driver's claim was "phony," and that the other driver's insurance company was
the plaintiff in the justice-court case that resulted in the judgment against him. His argued that,
because he had an insurance policy in effect at the time of the accident, his license could not have
been validly suspended. Defendant's Exhibits 1 and 2 show that Lohmuller was the insured in a
six-month automobile policy which became effective at 12:01 a.m. on March 15, 1991, issued by
Farmers Texas County Mutual Insurance Company.
Â Â Â Â Â Â Â Â Â Â On cross-examination, Lohmuller admitted that he was driving in Ellis County on May 22,
1993. He would not agree that his license was suspended on that day, and he denied ever having
seen the suspension order issued by the Department. He said that he had not driven again since
that day.
SPEEDY TRIAL
Â Â Â Â Â Â Â Â Â Â Lohmuller first asserts that the trial, held more than two years after he was charged,
violated his right to a speedy trial under the Sixth Amendment of the United States Constitution
and article 32A.02 of the Code of Criminal Procedure. U.S. Const. amend. VI; Tex. Code
Crim. Proc. Ann. art. 32A.02, Â§1(3) (Vernon 1989).


 The information was filed on June 9,
1993. On July 12, 1995, Lohmuller filed a "Motion to Quash or Dismiss," asserting that the State
was not ready for trial. The motion was denied.
Â Â Â Â Â Â Â Â Â Â As the State points out, no right to a speedy trial exists by statute. See Cover v. State, 913
S.W.2d 611, 620 (Tex. App.âTyler 1995, pet. ref'd). Further, it says that Lohmuller never
asserted a constitutional right to a speedy trial.
Â Â Â Â Â Â Â Â Â Â The right to a speedy trial is subject to a balancing test to determine whether the right has
been abridged. Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101
(1972). The court should inquire about (1) the length of the delay, (2) reasons for the delay, (3)
the circumstances of the defendant's assertion of the right, and (4) any prejudice that resulted from
the delay. Id. Because Lohmuller did not request that the court make such an inquiry, he has not
preserved this claim for our review. We overrule point one.
THE INFORMATION
Â Â Â Â Â Â Â Â Â Â Lohmuller next asserts that the information is invalid because (1) "it cannot be established
when the information was presented to the court," (2) it was not signed by the county attorney
"officially," and (3) it is fundamentally defective because it does not allege that Lohmuller had a
statutory duty.
Â Â Â Â Â Â Â Â Â Â Objections to a charging instrument must be made before the date on which a trial on the
merits begins. Tex. Code Crim. Proc. Ann. art. 1.14(b) (Vernon Supp. 1996); DeDonato v.
State, 819 S.W.2d 164, 167 (Tex. Crim. App. 1991). Neither of Lohmuller's two pretrial
motions attacked the information on the grounds now asserted on appeal.


 Lohmuller first called
the court's attention to the alleged defects in the information after the State had rested its case-in-chief. Thus, all defects in the charging instrument were waived. Id. We overrule point two. 
LIABILITY INSURANCE
Â Â Â Â Â Â Â Â Â Â Lohmuller's primary assertion, at trial and on appeal, is that he had a policy of insurance
in force at the time of the 1991 accident which resulted in his license being suspended and that the
existence of that policy is a complete defense to the 1993 charge of driving with a suspended
license. Further, he maintains that filing proof of insurance with the Department of Public Safety,
as he had done by the time of trial, removed the suspension retroactively, so that the record stands
as though the suspension were never issued. Both reasons, he says, are sufficient to justify an
acquittal.
Â Â Â Â Â Â Â Â Â Â Before presenting the charge to the jury, the court, Lohmuller, and the prosecutor
discussed whether the presentation of an existing policy to the Department would retroactively lift
a suspension. The court observed that Defendant's Exhibit 2 contained a notice from the
Department dated August 10, 1995, thirteen days before trial, requesting a letter from the
insurance company acknowledging coverage and stating, "Upon receipt of the letter from your
insurance company, further consideration will be taken in the above referenced accident case." 
The court then stated:
Well, I don't know. If nothing else, I'll make it real clear on the record so that if
he wants to appeal, he can do that and an appellate court can tell us he's right, you can
even go backwards and say that he should have been unsuspended from day one and
therefore if you've got a DWLS during that period of time, you shouldn't have . . . . I
don't know that that's the law or not.
Â Â Â Â Â Â Â Â Â Â Lohmuller simply points to section 1D of article 6701h, the Safety Responsibility Law (the
Act), as providing an unambiguous defense to the criminal charge when a liability insurance policy
was in force on the day of the occurrence that led to the suspension. Tex. Rev. Civ. Stat. Ann.
art. 6701h, Â§ 1D (Vernon Supp. 1996). Section 1D provides:
It is a defense to prosecution under this Act if the person charged produces in court
an automobile liability insurance policy or a certificate of self-insurance previously issued
to that person that was valid at the time that the offense is alleged to have occurred and the
charge shall be dismissed.
Id.
Â Â Â Â Â Â Â Â Â Â The State argues that, after a suspension order is issued by the Department, a criminal
prosecution for driving while subject to that suspension may be maintained at any time until the
suspension is lifted by the Department. In other words, the administrative acts of the Department
determine whether a suspension was in effect for purposes of the penal provision making it an
offense to drive while a suspension order remains in effect.
Â Â Â Â Â Â Â Â Â Â The Act covers definitions, administration, security following an accident, proof of
financial responsibility for the future, violations of the Act and penalties for those violations, and
general provisions. Id. Â§Â§ 1â43 (Vernon 1977 & Supp. 1996). In 1981, the legislature added
sections 1A through 1G.


 Although placed in the existing part of the Act that defines words and
phrases, these additional provisions generally strengthened and clarified the requirements for
maintaining liability insurance on most vehicles operated within the state, required that evidence
of insurance be carried in the vehicles and displayed to a peace officer upon request, and imposed
penalties such as suspending driver's licenses and registrations for failing to maintain the required
insurance protection. Id. The current versions of sections 1A and 1B of article 6701h require that
insurance be maintained and that evidence of insurance be carried in each vehicle and displayed
upon request. Id. Â§Â§ 1A, 1B (Vernon Supp. 1996). Section 1C imposes specific penalties for
failing to do so. Id. Â§ 1C. Section 1D, as amended by the Legislature in 1983, provides "a
defense to prosecution under th[e] Act." Id. Â§ 1D.
Â Â Â Â Â Â Â Â Â Â Unfortunately, the Act is less than clear about the instances in which section 1D applies. 
See id. If Lohmuller is correct and the Act is read literally, section 1D provides for a defense to
any prosecution under the entire Act. We believe, however, that the placement of section 1D and
the circumstances under which it was amended demonstrate that it applies only to prosecutions
brought under section 1C. Contrasted with the penalties for failing to maintain insurance as
described in section 1C, the offense of and penalties for driving while one's license is suspended
are contained in section 32 of the Act. Id. Â§ 32. Section 32 covers violations of all suspensions
under the Act, no matter how the suspension occurred. Id. Section 32(c)(3) provides a defense
to a driver who did not receive actual notice of a suspension or revocation order.


 Id. Â§ 32(c)(3). 
Â Â Â Â Â Â Â Â Â Â We are further persuaded that the defense in section 1D does not apply to every prosecution
under the entire Act by the fact that the overall scheme of the Act allows one in Lohmuller's
position other opportunities to present his defense to a suspension resulting from not having
insurance coverage at the time of an accident. He or his insurance company could have defended
the "phony" claim in justice court. He could have contested the suspension order before or after
it was issued. He could have notified the Department that he held a policy of insurance before
being arrested for driving in violation of its suspension order. Instead, he waited until two years
had elapsed after being charged and almost until the day of trial to begin the process of notifying
the Department that he had a policy of insurance in force on the date of the accident.
Â Â Â Â Â Â Â Â Â Â For these reasons, we conclude that the legislature did not intend for section 1D to provide
a defense to one charged under section 32 of the Act. Id. Â§Â§ 1D, 32.
Â Â Â Â Â Â Â Â Â Â Lohmuller's second argument under this pointâthat the suspension had been lifted
retroactively when he filed corrective documents with the Departmentâis refuted by the record. 
As of the date of trial, the Department had not accepted the filings and had notified him that
further action on the part of his insurance company was necessary. Additionally, we note that the
Act speaks in terms of "reinstat[ing]" and "restor[ing]" a person's driving privilege. Id. Â§Â§ 13(c),
16(b) (Vernon 1977). Nowhere in the Act do we find that the termination of a suspension operates
retroactively.
Â Â Â Â Â Â Â Â Â Â We overrule point two.
CONSTITUTIONALITY
Â Â Â Â Â Â Â Â Â Â Lohmuller's driver's license and registration were originally suspended on August 6, 1992
under section 13(a) of the Act. In his final point, Lohmuller asserts that section 13 is
unconstitutional because (1) it "appears to be an ex post facto law which is prohibited by Article
I section 9c to the federal government and section 10a to the states" and (2) the suspension took
place without a prior hearing or a post-suspension hearing. Section 13 is ex post facto, he says,
"because I had a defense to the alleged judgment against me, that defense being that the plaintiff
submitted a false insurance claim, as there was no damage done." He says that the denial of a
hearing deprived him of "a fair chance to tell his side of the story prior to or shortly after the
declaration by the state that his license was suspended."
Â Â Â Â Â Â Â Â Â Â Lohmuller's reliance on the ex post facto provision is misplaced. An ex post facto law is
one that (1) criminalizes formerly innocent acts done before the law is passed, (2) aggravates a
crime or makes it greater than when committed, (3) increases the punishment after the act was
committed, or (4) alters legal rules so that less or different evidence is required to convict than was
required at the time of commission. Hill v. State, 146 Tex. Crim. 333, 171 S.W.2d 880, 883,
cert. denied, 320 U.S. 806, 64 S.Ct. 72, 88 L.Ed. 487 (1943). He does not assert that the Safety
Responsibility Law does any of those; rather, he relies on the fact that he had a defense to the
1991 justice-court action.
Â Â Â Â Â Â Â Â Â Â With respect to Lohmuller's second approach to the constitutionality of the statute, we note
that the Department's suspension order was based on a judgment of a court. Because a justice-court judgment is entitled to a presumption of regularity, we must presume that Lohmuller had
notice of that proceeding. The suspension by the Department is automatic when it is presented
with a judgment of a court of competent jurisdiction that establishes liability arising out of a motor
vehicle accident. Tex. Rev. Civ. Stat. Ann. art. 6701h, Â§ 13(a) (Vernon 1977).
REASONABLE DOUBT
Â Â Â Â Â Â Â Â Â Â In reviewing the court's charge, we find that the court did not include the required
definition of "reasonable doubt." Geesa v. State, 820 S.W.2d 154, 162 (Tex. Crim. App. 1991). 
We have previously held that the right to the definitional instruction on reasonable doubt is an
absolute right which we must implement without the procedural formality of a point of error. See
Kieschnick v. State, 911 S.W.2d 156, 163 (Tex. App.âWaco 1995, no pet.) (on rehearing). 
Thus, we hold that the court erred when it failed to include the mandatory definitional instruction
on reasonable doubt in the charge given to the jury. Id. Because the error is not subject to a harm
analysis, we must reverse the judgment. Id.
CONCLUSION
Â Â Â Â Â Â Â Â Â Â Although no error occurred at trial other than the failure to charge the jury on the definition
of reasonable doubt, we reverse the judgment and remand for a new trial. 
Â Â Â Â Â Â Â Â Â Â We note that Lohmuller's brief requested a "writ of mandamus" to "order the Texas
Department of Public Safety to terminate the suspension of appellant's expired driver's license." 
However, before submission, he filed a motion to withdraw this request, saying that the
Department has terminated its suspension. The motion to withdraw is granted. 
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â BILL VANCE
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice


Before Justice Cummings and
Â Â Â Â Â Â Â Â Â Â Justice Vance
Reversed and remanded
Opinion delivered and filed April 17, 1996
Publish 



other was at work, more
than ten times and so many times that she could not remember how many.  Id.Â  Hulsey began having intercourse with Latoya when she was approximately
fifteen.Â  Id.Â  Over about a two-year period, Hulsey sexually assaulted
her more than fifty times and that the number may have been one hundred times,
which is what she had told police. Â Id.Â  LatoyaÂs two sisters also saw
Hulsey on top of Latoya.Â  Id.Â  Latoya did not testify to specific
instances of sexual assaults or indecency.Â  Id. at 855.

The trial court denied HulseyÂs motion to require
the State to elect.Â  Id.Â  Hulsey argued that this denialÂ was error
as to two counts of sexual assault and two counts of indecency by contact.Â  Id.Â  As to the two counts of indecency by contact with LatoyaÂs genitals and breast,
we found, beyond a reasonable doubt, that the trial courtÂs failure to require
the State to elect did not contribute to HulseyÂs conviction or punishment
because Latoya related a sequence of events that occurred every time Hulsey
assaulted her and provided no other details.Â  Id. at 856 (citing Dixon, 201 S.W.3d at 734-36).Â  As to the two counts of sexual assault, a specific
incident had been identified for each count; thus, it would have been clear as
to which incidents the State was relying on for conviction.Â  Id. at 857
(citing Phillips, 130 S.W.3d at 355).Â Â  Â 

Unlike the victims in Phillips and Farr,
Brenda did not testify in detail
about any specific incidents of charged conduct.Â  Thus, the jurors were not
given a choice of incidents from which to choose for conviction on each charged
offense.Â  Neither was BrendaÂs testimony as general as that of the victim in Farr.Â 
In Farr, K.R. merely testified that the particular offense occurred
Âevery chance [Farr] got,Â that they were alone during the offense, and that the
offenses did not occur during the incidents of oral sex.Â Â  Here, as to each
offense, Brenda identified how the offenses occurred, the school year during
which the offenses occurred, where the offenses occurred, what time of day the
offenses occurred, and how often the offenses occurred.Â  She also provided some
details of what took place during each offense.

Like the victims in Dixon and Hulsey,
Brenda described a sequence of events that occurred each time Jackson committed
a particular offense.Â  See Dixon, 201 S.W.3d at 732; see also
Hulsey, 211 S.W.3d at 856.Â  All the incidents for each offense were presented
with equal specificity and, except for the fact that the offenses occurred in
different locations in or around the home or their property, none of the
incidents were distinguishedÂ in any manner from each other. Â See Dixon, 201 S.W.3d at 734.

Moreover, the unanimity requirement was emphasized
during trial.Â  In closing, defense counsel reminded the jury that: (1) the
evidence consists of Âassaults or indecencies going on over a long period of
timeÂ; (2) Âbefore you can convict Amos [Jackson] of any one of these youÂve
got to unanimously agree that the State has proved one transaction, one event,
beyond a reasonable doubtÂ; (3) Âif the case has been proven on any of these, youÂve
got to agree on one eventÂ; and (4) ÂyouÂve got to agree on a specific event,
that all of the elements of that particular charge are proved beyond a
reasonable doubt on that particular case.ÂÂ  In its jury charge, the trial court
instructed the jury that before Âreaching a verdict of guilty under any
individual indictment tried in this trial, the jury must agree that all of the
elements charged in the individual indictment under consideration occurred in a
single incident in the manner alleged in that individual indictment.ÂÂ  We cannot say that Jackson was deprived of a
unanimous verdict.Â  See Dixon, 201 S.W.3d at 735; see
also Hulsey, 211 S.W.3d at 856.Â  

Neither can we say that Jackson was deprived of
notice or an opportunity to defend against the particular offenses on which the
State intended to rely for conviction.Â  Other than the locations in the home
where the offenses occurred, there was no distinction between BrendaÂs account
of each offense.Â  See Dixon, 201 S.W.3d at 736.Â  Jackson was
not deprived of notice or an opportunity to defend.Â Â Â Â  

In summary, we find, beyond a reasonable doubt,
that the trial courtÂs failure to force the State to make an election did not
contribute to JacksonÂs conviction or punishment.Â  See Dixon, 201 S.W.3d at 734-36;
see also Hulsey, 211 S.W.3d at 856.Â Â We overrule JacksonÂs first issue.

MOTION TO QUASH

Â Â Â Â Â Â Â Â Â Â Â  JacksonÂs second issue challenges the
denial of his motion to quash the indictments. Â We review a trial courtÂs ruling on a motion to quash an indictment
for abuse of discretion.Â  State v.
Flournoy, 187 S.W.3d 621, 623 (Tex. App.ÂHouston [14th Dist.] 2006, no pet.).

Â Â Â Â Â Â Â Â Â Â Â  Each indictment charged Jackson with committing an offense that occurred Âon or aboutÂ a specific date.Â  Jackson filed a motion to quash the indictments on grounds that each offense was alleged to
have occurred more than once and Âit is impossible to know which of the
multiple offenses was the actual offense authorized by the Grand Jury for
prosecution.ÂÂ  The trial court denied the motion.Â  On appeal, Jackson contends
that he could not Âdetermine that the offense for which he was convicted was
the very same event or set of facts indicted by the Grand Jury and that at
least nine members of the Grand Jury returning this indictment agreed upon the
same set of facts.Â

In Weatherby
v. State, 61 S.W.3d
733Â (Tex. App.ÂFort Worth 2001, pet. refÂd), Weatherby was charged with
two counts of aggravated sexual assault of a child. Â See Weatherby, 61 S.W.3d
at 735.Â  The first count alleged, Âon or about December 24, 1998, aggravated
sexual assault of S.W. by contact of her sexual organ to the mouth or sexual
organ of appellant.ÂÂ  Id.Â  The second count alleged indecency with a
child by contact of her breast or genitals, but the jury charge submitted this
count as a lesser included offense of aggravated sexual assault.Â  Id.Â  The trial court denied WeatherbyÂs motion to quash the indictment.Â  Id.Â  On appeal, Weatherby argued that Âthere was no way of knowing whether the grand jury
indicted him on the same facts presented to the petit jury at trialÂ because the
indictment did not (1) Âspecifically allege the incident that he was going to
be tried forÂ; or (2) Âspecify the acts constituting the alleged offenses.ÂÂ  Id.Â  The Fort Worth Court noted that the Âindictment tracked the language of the
respective statutesÂ and that, pretrial, the State had elected a primary
offense.Â  Id. at 736.Â  The trial court had Âspecifically asked the
prosecutor whether that was the offense presented to the grand jury and the
prosecutor responded that there was no evidence to the contrary.ÂÂ  Id.Â  Because there was no evidence that the Âoffenses presented to the grand jury
differed from the offenses proved at trial, the trial court did not abuse its
discretion.ÂÂ  Id. (citing Sledge v. State, 953 S.W.2d 253, 256 (Tex. Crim.
App. 1997)).

In Sledge, the indictment charged Sledge
with Âaggravated sexual assault and indecency with a child, alleging that the
offenses occurred on or about August 31, 1988.ÂÂ  Sledge, 953 S.W.2d at
254.Â  Sledge filed a motion requesting notice of extraneous offenses.Â  Id.Â  In its response, the State listed Âseveral instances of sexual abuseÂ and at
the pre-trial hearing, the ÂState revealed that the conduct of appellant
towards the victim had been continuous over several years.ÂÂ  Id.Â  At
SledgeÂs request, the State elected to Âproceed on two specifically described
episodes which occurred when the child was ten and eleven, because those
incidents were most clear in her mind.ÂÂ  Id.Â  On appeal, Sledge argued
that Âthe question is whether the State may obtain a conviction by proof of a
different act from the act upon which the grand jury indicted - - indeed by
proof of an act which the State has labeled Âextraneous.ÂÂÂ  Id. at 254.Â 
However, there was Âno evidence that the testimony presented to the grand jury
related to offenses other than those provenÂ at trial.ÂÂ  Id. at 256.

Although the State made elections in both Weatherby
and Sledge, but no elections were made in this case, Brenda did not
testify to any specific incidents from which the grand jurors could choose.Â  There
is simply no evidence that the Âoffenses presented to the grand jury differed
from the offenses proved at trial.ÂÂ  Weatherby, 61 S.W.3d
at 736; see Sledge, 953 S.W.2d at 256.Â  The trial court did not abuse
its discretion by denying JacksonÂs motions to quash.Â  See Weatherby,
61 S.W.3d at 736; see also Sledge,
953 S.W.2d at 256.Â  We overrule JacksonÂs second issue.

ABILITY TO HEAR THE EVIDENCE AND CONFRONT
WITNESSES

Â Â Â Â Â Â Â Â Â Â Â  In issue three, Jackson contends that
he could not hear the evidence presented at trial or confront the witnesses
against him in violation of article 38.31 of the Code of Criminal Procedure,
the Sixth and Fourteenth Amendments of the United States Constitution, and article
1, section 10 of the Texas Constitution. Â 

Â Â Â Â Â Â Â Â Â Â Â  At trial, Jackson informed the trial
court that he was having difficulty hearing the proceedings.Â  The trial court
obtained a set of headphones, which Jackson used for the remainder of trial.Â 
After trial, Jackson filed a motion for new trial, alleging that he was deaf,
could not hear the proceedings, and did not receive Âadequate hearing devices,Â
thereby depriving him of the rights to Âbe confronted by his accusers,Â Âfully
understand the nature of the proceedings,Â and Âtake part in his own defense.Â

Â Â Â Â Â Â Â Â Â Â Â  At a hearing on the motion, Jackson testified that he has an 82.5 percent hearing loss and completed a sign language
course. Â He was not fluent, but could understand sign language when used slowly.Â 
He received an award for his ability to work despite his inability to hear
without hearing aids.Â  During voir dire, he could not hear the panelÂs responses.Â 
When using the headphones, he could hear the witnesses, but could not hear the
testimony of the sexual assault nurse examiner when she turned to draw diagrams
on the board, the testimony of witnesses when the microphones went out, or a
video that had been played.Â  He received headphones on the second day of trial.

Â Â Â Â Â Â Â Â Â Â Â  On cross-examination, Jackson told the
prosecutor that he could not hear her, that she needed to speak slowly so he
could read her lips, and that the Âhigh pitchÂ of her voice caused him to have
trouble hearing.Â  When asked, Jackson later told the prosecutor, who was using
a microphone, that he could hear her because she was close to him and he was
reading her lips.Â  He admitted that he had appeared before the trial court
several times before trial, including arraignment and pretrial hearings.Â  He
claimed that, during his bail hearing, he advised the trial court of his
hearing problems. He had not previously informed the trial court of his 82.5
percent hearing loss, but explained that he had not been asked.Â  Even after
receiving the headphones, he told his attorney that he was having problems
hearing and his attorney expressed his own hearing difficulties.Â  They informed
the judge who instructed them to tap on the microphones to make them Âwork
properly.ÂÂ  He did not tell the trial court of the need for an interpreter, but
explained that he cannot Âunderstand sign very fast.ÂÂ  Neither did he ask for
any form of writing regarding the witnessesÂs testimony.

Â Â Â Â Â Â Â Â Â Â Â  On redirect, Jackson stated that his
previous court appearances took place at the bench, which enabled him to read
the judgeÂs lips.Â  On re-cross, Jackson stated that he can hear with his
hearing aids when he is Âout in the open where thereÂs not so much of this
bouncing around in a room with background noise.Â

The prosecutor testified that for the first time during
a break, Jackson advised the trial court of his hearing problems.Â  The trial
court offered to search for a hearing device to plug into the sound system.Â 
Upon return from the break, the trial court told Jackson that he would have to
contact someone to obtain a hearing device.Â  Defense counsel did not object to
proceeding with voir dire until a device could be obtained.Â  When the device
was provided, the trial court inquired as to whether Jackson could hear and the
defense confirmed that he could hear fine. Â The defense made no other
indications that Jackson was having trouble hearing.Â  

The trial court placed his own recollection on the
record, which he subsequently detailed in findings of fact and conclusions of
law.Â  The trial courtÂs findings of fact state that: (1) before trial, it was
not advised of JacksonÂs hearing impairment, testimony regarding an impairment
was not presented, and it was not apparent that Jackson had any difficulty
hearing; (2) in the morning on the first day of trial, defense counsel advised
the trial court that Jackson was having trouble hearing; (3) defense counsel
did not object to proceeding until a hearing device could be obtained; (4)
during lunch, Jackson received a set of headphones attached to an audio device
plugged into the sound system and indicated that Âhe could hear fineÂ; (5)
Jackson used the device during the remainder of trial; (6) it was not apparent
that Jackson had any further trouble hearing and there were no additional
objections on the issue; and (7) Jackson Âappeared to confer with his attorney
during the trial without difficulty and thus it was not apparent to the Court
that he had difficulty hearing during the rest of the trial.ÂÂ  

Â Â Â Â Â Â Â Â Â Â Â  The trial courtÂs conclusions of law
state that: (1) the trial court Âdevised a suitable remedyÂ to which Jackson
and his counsel agreed; and (2) Jackson was not denied due process, the
opportunity to confront witnesses, the Âright to participate in his trial or
the ability to understand the proceedings in his case.ÂÂ  The trial court denied
 JacksonÂs motion.Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â 

Â Â Â Â Â Â Â Â Â Â Â  On appeal, Jackson argues that he
qualifies as a Âdeaf person;Â thus, the trial court was required to either provide
an interpreter or, if the defendant is unable to understand sign language,
Âfashion a remedy suitable to overcome the defendantÂs disability.ÂÂ  Despite
the provided headphones, Jackson maintains that he could not hear Âessential
portionsÂ of the trial.Â  

Â Â Â Â Â Â Â Â Â Â Â  A trial court must provide an
interpreter for a deaf person.Â  See Tex.
Code Crim. Proc. Ann. art. 38.31(a) (Vernon Supp. 2008). Â ÂThe statute implements
the constitutional right of confrontation, which includes the right to have
trial proceedings presented in a way that the accused can understand.Â Â Salazar v. State, 93 S.W.3d 339, 340 (Tex. App.ÂTexarkana 2002, pet. refÂd). Â If the defendant cannot understand sign
language, the trial court must Âfashion a remedy suitable to overcome the
defendantÂs disability.ÂÂ  Lincoln v. State,
999 S.W.2d 806, 809 (Tex. App.ÂAustin
1999, no pet.). Â ÂA defendantÂs failure to object or request relief does not waive
his confrontation right if it is otherwise apparent that he cannot hear or
understand the proceedings.Â Â Id.

In Lincoln, Lincoln argued that the trial court failed to
Âmake proper accommodations for his hearing impairment,Â depriving him of his
right to confront witnesses and right to an interpreter. Â See id. at
807.Â  Lincoln was not deaf, but had
difficulty hearing.Â  Id. at 809.Â  During trial, he advised the trial
court of this problem.Â  Id.Â  The trial court allowed Lincoln to move or
the Âspeakers repeated themselves to permit [Lincoln] to hear.ÂÂ  Id.Â  Lincoln Âdid not indicate at the time that these arrangements were
unsatisfactory.ÂÂ  Id.Â  He was also Âaddressed by the court and responded
appropriately, indicating that he heard and understood what was said,Â and Âtwice
took the stand and testified without difficulty.ÂÂ  Id. at 809-10.Â  Only
after trial ended did Lincoln tell the trial court that he could not hear much
of the time.Â  Id. at 810.

Because the trial court observed Lincoln
throughout trial, it was in the Âbest position to judge the credibility of [LincolnÂs] claim that he did not hear the proceedings.ÂÂ  Id.Â  ÂWhile the failure of
appellant or his attorney to tell the court earlier that appellant could not
hear the proceedings is not a bar to raising the issue on appeal, it is
relevant to the question whether the district court knew or should have known
that additionalÂ remedies were needed.ÂÂ  Id.Â  The Austin Court held
that, Â[c]onsidering what the district court was told and observed during the
trial, we are not persuaded that the court failed to take constitutionally
adequate steps to assure that [Lincoln] heard and understood the proceedings.ÂÂ 
 Id.

In Salazar, Salazar complained that Âwhen it became apparent he could not hear the
witnesses because of his hearing impairment, the court was required to provide
him an interpreter or some other means of communication that would permit him
to participate in the proceedings.ÂÂ  Salazar, 93 S.W.3d at 340.Â Â However, ÂSalazar
was addressed by the court or by counsel and responded appropriately,
indicating that he heard and understood what was said.ÂÂ  Id. at 341. Â Not
until the victims finished testifying did Salazar tell the trial court that he
could not hear the testimony. Â See id.Â  ÂUntil then the trial judge had
every reason to believe Salazar was able to understand the proceedings and
testimony, and no reason to the contrary.Â Â Id.Â  Thus, the trial court Âcould
not be expected to take action to ensure that the testimonyÂs content was
effectively communicated to Salazar.ÂÂ  Id. Â Because the trial court was
in the best position toÂ judge the credibility of SalazarÂs complaint, the Texarkana Court was Ânot persuaded [that] the court failed to take constitutionally adequate
steps to ensure Salazar heard and understood the proceedings.ÂÂ  Id.

Jackson briefly
testified outside the juryÂs presence as to proceeding or resting his case.Â 
His attorney asked to be informed if Jackson could not hear him.Â  The record
indicates that Jackson did not have difficulty testifying, but responded
appropriately and appeared to hear and understand what was being said.

Jackson had
also appeared before the court on several occasions before trial and never
indicated that he could not hear or understand what was being said.Â  Once Jackson advised the trial court of his
hearing difficulties, the trial court provided the set of headphones connected
to the sound system.Â  According to the record, this was done before voir dire.Â 
The trial court asked the defense if the device satisfied Jackson and counsel
responded that Jackson could hear fine.Â  He did not indicate either at that
time, or any other time, Âthat these arrangements were unsatisfactory.ÂÂ  Lincoln,
999 S.W.2d at 809.Â  Thus, the trial court
had every reason to believe that Jackson could hear and understand the
proceedings and, without information to the contrary, could not be expected to
take any other action.Â  Only after trial ended did Jackson inform that trial
court of his 82.5 percent hearing loss or his inability to hear portions of the
proceedings.Â  His failure to inform the trial court, at an earlier time, that
he could not hear the proceeding, is relevant to the whether the trial court
knew or should have known of JacksonÂs need for ÂadditionalÂ remedies.ÂÂ  Id.Â  Â Â 

Having observed Jackson throughout trial, the
trial court was in the Âbest position to judge the credibility of [his] claim
that he did not hear the proceedings.ÂÂ  The record does not indicate that the trial
court Âfailed to take constitutionally adequate steps to assure that [Jackson] heard and understood the proceedings.ÂÂ  Lincoln, 999 S.W.2d at 810; see Salazar, 93 S.W.3d
at 341. Â We overrule issue three.




Because we have overruled JacksonÂs three issues,
we affirm the judgment in each of the six cases listed above.Â  Â Â Â Â Â Â Â Â Â Â Â Â 


Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â 

Â  

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

Affirmed

Opinion delivered and
filed September 3, 2008

Do not publish

[CRPM]

Â 









[1] Â Â Â Â Â Â Â Â Â Â Â Â Â  ÂBrenda DanielsÂ is a pseudonym.Â  





[2] Â Â Â Â Â Â Â Â Â Â Â Â Â  Brenda also testified that, on two
occasions, Jackson made her watch a pornographic film.Â  When Brenda was in
eighth grade, Jackson attempted to penetrate her vagina with his penis on two
occasions, once in the fall of 2004 and once in April 2005.Â  Both acts occurred
in BrendaÂs bedroom.Â  She and Jackson were unclothed.Â  Jackson was not charged
with penetrating BrendaÂs sexual organ with his sexual organ.